UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:21-CV-00293-CHB-CHL

**CURTIS NELSON,**                                                                   **Plaintiff,**

v.

**METALSA STRUCTURAL PRODUCTS, INC.,**                    **Defendant.**

### REPORT AND RECOMMENDATION

Before the Court is a motion for default judgment filed by Plaintiff Curtis Nelson ("Plaintiff"). (DN 12.) Defendant Metalsa Structural Products, Inc. ("Defendant") has not responded to the motion and the time to do so has expired. *See* L.R. 7.1(c). United States District Judge Claria Horn Boom referred this matter to the undersigned Magistrate Judge "for findings of fact, conclusions of law, and recommendation in accordance with 18 U.S.C. § 636(b)(1)(B)." (DN 14, at PageID # 90.)

**I.  FINDINGS OF FACT[1]**

Plaintiff was employed by Defendant between July 2019 and March 2020, at which time he worked as a "Rail Tech." (DN 1, at PageID # 2.) Plaintiff's starting hourly compensation was $14.55 for regular pay and $21.825 overtime pay, and at the time he was terminated, his hourly rate was $15.75 for regular pay and $23.625 for overtime pay. (*See generally* DN 12-3.) Around March 6, 2020, Plaintiff was involved in an altercation with another employee. (DN 1, at PageID # 2.) Consequently, his employment was terminated while the other employee remained employed

---

[1] "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (citing *Pope v. United States*, 323 U.S. 1, 12 (1944); *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974). See Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). The undersigned's Findings of Fact comport with the general rule.

despite that she "was the aggressor in the altercation and physically assaulted [Plaintiff] by punching him in the chest after invading his workstation." (*Id.* at 2–3.) White employees, often white women, had been involved in verbal and physical altercations that were "similar or worse" in comparison to the incident involving Plaintiff. (DN 12-1, at PageID # 31.) (*See* DN 1, at PageID # 3.) However, unlike Plaintiff, who is a black man, those employees were never punished. (DN 12-1, at PageID # 31.) Following his termination, Plaintiff "immediately started searching for new employment . . . [and] applied to approximately 26 different employers without receiving an offer of employment." (*Id.* at 32.) In December 2020, Plaintiff accepted a position at Sovereign Staffing Group, Inc. ("Sovereign Staffing"), where he worked fewer hours and earned lower wages compared to his employment for Defendant. (DN 12-6.) In February 2021, Plaintiff left his position with Sovereign Staffing. (DN 16-2, at PageID # 101.) On July 1, 2021, Defendant accepted a position at Guess Warehouse with greater compensation than he earned working for Defendant. (DN 12-1, at PageID # 32.) In the interim between his employment for Sovereign Staffing and for Guess Warehouse, Plaintiff received about $1600 per week in unemployment compensation. (DN 16-2, at PageID # 102.)

On May 11, 2021, Plaintiff brought this action against Defendant alleging race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and the Kentucky Civil Rights Act, K.R.S. § 344.010, *et seq.* (DN 1.) Defendant was served with a summons and the complaint on May 20, 2021. (DN 4.) Defendant subsequently failed to appear or respond to the complaint, and on July 16, 2021, Plaintiff moved for an entry of default. (DN 5.) On July 20, 2021, the Clerk of Court issued an entry of default (DN 6); Plaintiff then filed the instant motion for default judgment. (DN 12.) Upon review of the motion, the undersigned found that he lacked sufficient evidentiary support for the requested judgment and therefore ordered

Plaintiff to file any supplementary briefing and evidence supporting his motion. (DN 15, at PageID # 92–95.) On April 29, 2022, Plaintiff filed his supplement to the motion for default judgment. (DN 16.)

## II. CONCLUSIONS OF LAW

Plaintiff seeks a judgment in the amount of $59,557.87 for back pay and attorney's fees and costs.[2] (DN 16, at PageID # 96.) Rule 55(b) of the Federal Rules of Civil Procedure authorizes default judgment:

> **(1) *By the Clerk.*** If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.
>
> **(2) *By the Court.*** In all other cases, the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to:
>
> > **(A)** conduct an accounting;
> >
> > **(B)** determine the amount of damages;
> >
> > **(C)** establish the truth of any allegation by evidence; or
> >
> > **(D)** investigate any other matter.

Fed. R. Civ. P. 55(b).

---

[2] As the undersigned details throughout his Conclusions of Law, Plaintiff requests different judgment amounts in his motion for default judgment and supplement. Plaintiff does not provide an explanation for the inconsistency but is clear from the filings that the departure from the earlier request resulted from an updated damages calculation between filing the motion and the supplement.

Plaintiff is entitled to a judgment as to Defendant's liability because it ignored this lawsuit after being properly served with process. However, a default judgment on well-pleaded allegations "establishes only defendant's liability; plaintiff must still establish the extent of damages." *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995). " 'Even when a default judgment is warranted based on a party's failure to defend, the allegations of the complaint with respect to the amount of damages are not deemed true. The district court must instead conduct an inquiry to ascertain the amount of damages with reasonable certainty.' " *Vesligaj v. Peterson*, 331 F. App'x 351, 355 (6th Cir. 2009) (quoting *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). This inquiry need not include a hearing. *Id.* at 355. No hearing is warranted where, as here, Defendants have not offered anything opposing Plaintiff's evidence. *Minyard v. Burrell*, No. 1:09-CV-90, 2011 WL 5188937, at *1 (W.D. Mich. Aug. 9, 2011), *report and recommendation adopted*, No. 1:09-CV-00090, 2011 WL 5180158 (W.D. Mich. Nov. 1, 2011) (citing *Lanzafame v. Toquir Contracting, Inc.*, 545 F. Supp. 2d 255, 257 (E.D.N.Y. 2007)).

### A. Back Pay

Plaintiff seeks to recover a total of $55,908.375 in back pay, including lost wages and retirement contributions. (DN 16, at PageID # 96.) "An award of back pay in Title VII cases is presumptively favored." *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 821 (6th Cir. 2016) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420 n. 12 (1975)). However, the amount a plaintiff may recover is subject to statutory limitations. For example, Title VII imposes statutory caps on damages based on employer size. For employers with:

- 15 to 100 employees, the cap is $50,000.
- 101 to 200 employees, the cap is $100,000.
- 201 to 500 employees, the cap is $200,000.
- More than 500 employees, the cap is $300,000.

42 U.S.C. § 1981a(b)(3).

A plaintiff seeking a default judgment in the amount of the maximum statutory cap must prove that the defendant employer had the requisite number of employees, otherwise damages are limited to the minimum statutory cap. *Hyster v. Ethel Hedgeman Lyle Acad.*, No. 4:08-CV-1664 CAS, 2009 WL 1850912, at *2 (E.D. Mo. June 29, 2009); *E.E.O.C. v. Carter Behav. Health Servs., Inc.*, No. 4:09-CV-122-F, 2011 WL 5325485, at *6 (E.D.N.C. Oct. 7, 2011), *report and recommendation adopted*, No. 4:09-CV-122-F, 2011 WL 5325473 (E.D.N.C. Nov. 3, 2011); *E.E.O.C. v. N. Am. Land Corp.*, No. 1:08CV501, 2010 WL 2723727, at *1 (W.D.N.C. July 8, 2010). However, because Plaintiff has also pled a cause for relief pursuant to the Kentucky Civil Rights Act, which places no limit on compensatory damages, the undersigned finds that Plaintiff is not limited by the caps imposed by Title VII and is therefore not required to prove that Defendant employs a threshold level of employees. *See Joss v. United Home Mortg. Ctr. of Fla., Inc.*, No. 09-60411-CIV, 2011 WL 13272300, at *4 (S.D. Fla. Jan. 26, 2011), *report and recommendation adopted*, No. 09-60411-CV, 2011 WL 13272301 (S.D. Fla. Mar. 7, 2011) (declining to apply Title VII damages cap due to the plaintiff's claims under the Florida Civil Rights Act, which did not impose any cap on damages). Consequently, the undersigned need only assess whether the amount of claimed damages is factually supported.

In *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, the Sixth Circuit explained:

> While a Title VII plaintiff bears the burden of proving damages with "reasonable certainty," *see Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1192 (6th Cir. 1983) (citing *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 314–16 (6th Cir. 1975)), "back pay in a Title VII case need not be proven with the exactitude of lost profits in a breach of contract case," *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 520 (6th Cir. 2009) (quoting *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 880 (6th Cir. 1991)). "Backpay should be awarded even where the precise amount of the award cannot be determined. Any ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer." *Rasimas*, 714 F.2d at 628 (citations omitted). Generally,

> back pay is calculated by subtracting "the amount that the plaintiff actually earned while being discriminated against [from] the amount that the plaintiff would have earned if no discrimination had occurred." *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 821 (6th Cir.), cert. denied, ⸺ U.S. ⸺, 137 S.Ct. 198, 196 L.Ed.2d 128 (2016).

880 F.3d 791, 799 (6th Cir. 2018).

Consistent with this guidance, in assessing the amount of the requested back-pay award, the undersigned will determine the difference from Plaintiff's expected compensation but for his discriminatory termination and his actual compensation during the back-pay period.[3]

### 1. Lost Wages

In his motion for default judgment, Plaintiff calculated lost wages in an amount totaling $54,558.45. (DN 12, at PageID # 28.) Plaintiff provided his earnings statements from his employment for Defendant as evidence of the amount he would have expected to earn, and he provided earnings statements from his subsequent employment for Sovereign Staffing as evidence of his actual earnings. (DN 12-1, at PageID # 30–31.) In the April 8, 2022 order for supplement, the undersigned found that this evidence provided a sufficient basis to determine the amount Plaintiff would have earned if not for Defendant's discrimination, but did not sufficiently substantiate the amount of Plaintiff's actual earnings during the pack-pay period. (DN 15, at PageID # 93.) The undersigned therefore ordered him to file any supplemental affidavits or

---

[3] Although Title VII imposes a duty to mitigate damages, the undersigned need not determine whether and to what extent Plaintiff conformed with that duty in considering his motion for default judgment.

> [W]here, as here, a defendant has offered no evidence indicating that "substantially equivalent positions ... were available" and that "the claimant failed to use reasonable care and diligence in seeking such positions," *Rasimas*, 714 F.2d at 624 (citations omitted), a plaintiff has no legal obligation to demonstrate that he sought or obtained comparable employment after his unlawful termination.

*Pittington*, 880 F.3d at 801.

documentary evidence substantiating the amount of his actual earnings during the back-pay period. (*Id.* at 95.)

In his supplement to his motion for default judgment, Plaintiff calculates lost wages in an amount totaling $55,908.375. (DN 16, at PageID # 96.) Plaintiff's calculation assumes that, if not for Defendant's discrimination, his hourly compensation for regular pay ($15.75) and overtime pay ($23.625) would have continued from his termination date through the entire back-pay period. (DN 16-2, at PageID # 101.) Absent contradictory evidence, the undersigned finds it reasonable to conclude that his rate of compensation would have remained constant for roughly sixteen months had he not been terminated. Plaintiff further assumes that he would have worked an average of 57 hours per week throughout the back-pay period, which he asserts is the average number of hours he worked per week at the time he was terminated. (*Id.*) Plaintiff does not explain how he calculated that average, but the undersigned's calculations below suggest that he averaged hours worked during the nine weeks in 2020 for which he received a full week's pay and rounded to the nearest hour. Plaintiff has not explained why weekly hours worked over these nine weeks would be consistent with the number of hours he expected to work each week over the subsequent sixteen months. In the absence of any convincing reason, the undersigned finds that extrapolating from such a small data set is not the best route toward reasonable certainty when more comprehensive information is available in the record. Plaintiff's earnings statements show the number of hours worked per week for the duration of his employment between July 8, 2019 and March 6, 2021. (DN 12-3.) The undersigned finds that the earnings statements over the course of those nine months are more likely to accurately reflect hours Plaintiff would have expected to work throughout the back-pay period.[4] The undersigned notes that Plaintiff omitted from its exhibits an

---

[4] The earnings statements filed in the record appear to be a compilation of images captured through cellphone screengrabs. (DN 12-3; DN 16-2.) The pay period dates for two of the earnings statements are cut off from their

earnings statement for the July 15 to July 21, 2019 pay period, and therefore this week will not be included in calculating average weekly hours worked. Additionally, the earnings statements show that for two successive weeks beginning December 23, 2019, Plaintiff collected wages for sixteen hours of holiday pay at his regular hourly rate. (DN 16-2, at PageID # 126, 128.) The undersigned finds it reasonable to assume that Plaintiff would take similar holiday leave in December 2020, so the undersigned therefore will not factor these weeks into his calculation of average weekly hours, and instead will separately add two weeks of holiday pay in calculating his total expected compensation. This calculation results in an average of 53.76 weekly hours worked, as summarized on the table below.

| Pay Period | Regular Rate Hours | Overtime Rate Hours | Total Hours |
|---|---|---|---|
| 7/8/19-7/14/19 | 37.25 | 0 | 37.25 |
| 7/15/19-7/21/19 | n/a | n/a | n/a |
| 7/22/19-7/28/19 | 40 | 12 | 52 |
| 7/29/19-8/4/19 | 40 | 5 | 45 |
| 8/5/19-8/11/19* | 40 | 8 | 48 |
| 8/12/19-8/18/19 | 40 | 12 | 52 |
| 8/19/19-8/25/19 | 48 | 8 | 56 |
| 8/26/19-9/1/19 | 40 | 0 | 40 |
| 9/2/19-9/8/19* | 40 | 0 | 40 |
| 9/9/19-9/15/19 | 40 | 20 | 60 |
| 9/16/19-9/22/19 | 44 | 20 | 64 |
| 9/23/19-9/29/19 | 40 | 20 | 60 |
| 9/30/19-10/6/19 | 48 | 4 | 52 |
| 10/7/19-10/13/19 | 52 | 20.73 | 72.73 |
| 10/14/19-10/20/19 | 40 | 12 | 52 |
| 10/21/19-10/27/19 | 48 | 12 | 60 |
| 10/28/19-11/3/19 | 40 | 12 | 52 |
| 11/4/19-11/10/19 | 40 | 12 | 52 |
| 11/11/19-11/17/19 | 44 | 17 | 61 |
| 11/18/19-11/24/19 | 52 | 8 | 60 |
| 11/25/19-12/1/19 | 40 | 0 | 40 |
| 12/2/19-12/8/19 | 44.03 | 0 | 44.03 |
| 12/9/19-12/15/19 | 40 | 4 | 44 |

---

respective pages. (DN 12-3, at PageID # 50, 54; DN 16-2, at PageID # 118, 122.) Based on the sequencing of the earnings statements as filed, the undersigned assumes these earnings statements are for the pay periods beginning August 5, 2019 and September 2, 2019 and factors them into his average weekly hours calculation, marked with an asterisk on the table below.

| | | | |
|---|---|---|---|
| 12/16/19-12/22/19 | 40 | 12 | 52 |
| 12/23/19-12/29/19 | 16 | 0 | 16 |
| 12/30/19-1/5/20 | 16 | 0 | 16 |
| 1/6/20-1/12/20 | 40 | 20 | 60 |
| 1/13/20-1/19/20 | 40 | 8 | 48 |
| 1/20/20-1/26/20 | 44 | 24 | 68 |
| 1/27/19-2/2/20 | 40 | 12 | 52 |
| 2/3/20-2/9/20 | 44 | 16 | 60 |
| 2/10/20-2/16/20 | 38.75 | 20 | 58.75 |
| 2/17/20-2/23/20 | 47.5 | 16 | 63.5 |
| 2/24/20-3/1/20 | 44 | 16.4 | 60.4 |
| 3/2/20-3/8/20 | 8.98 | 0 | 8.98 |
| 3/9/20-3/15/20 | n/a | n/a | n/a |
| 3/16/20-3/22/20 | 40 | 0 | 40 |
| Average hours worked per week (excluding weeks without earnings statements in the record) | 39.9 | 10.03 | 49.93 |
| Average hours worked per week through last work week prior to termination (excluding weeks without earnings statements in the record and December holiday weeks) | 42.44 | 11.33 | 53.76 |
| Average hours worked for full week's pay in 2020 | 42.03 | 14.71 | 56.74 |

Next, the undersigned determines Plaintiff's expected average weekly salary during the back-pay period by multiplying the average number of hours worked by Plaintiff's compensation rates. Plaintiff claims that he was paid at his regular hourly rate and was paid "overtime pay at the rate of $23.625 for each hour worked over forty (40) per week." (DN 16-2, at PageID # 101.) The record contradicts in part this claim. As summarized on the table above, there were numerous weeks when Plaintiff received regular pay for hours worked in excess of forty, perhaps due to caps on overtime pay. To capture this trend, the undersign calculates Plaintiff's expected weekly regular pay wages and overtime wages separately, and finds them respectively at $668.43 ($15.75x42.44) and $267.67 ($23.625x11.33) for a total expected weekly salary of $936.10. Therefore, over the 66 non-holiday weeks between March 6, 2020, and June 30, 2021, Plaintiff would have earned $61,782.68, plus $504 for two weeks of holiday pay for a total of $62,286.68.

9

The undersigned finds that this amount to be Plaintiff's reasonably expected wages during the back-pay but for his discriminatory termination.

Plaintiff has not provided a calculation of his actual earnings during the back-pay period, but there is sufficient evidence in the record for the undersigned to make a reasonable determination as to the amount. Plaintiff's sworn statements establish that he was unable to secure employment before he accepted the position with Sovereign Staffing in December 2020, which he maintained until February 2021. (DN 12-1, at PageID # 32; DN 16-2, at PageID # 101.) Plaintiff provided his 2020 and 2021 W-2 Wage and Tax Statements, which establish that he earned a total of $2,466.30 while employed by Sovereign Staffing. (DN 12-8, at PageID # 85; DN 16-2, at PageID # 142.) Plaintiff's 2021 W-2 statement establishes that he received $15,975 in unemployment compensation that year. (DN 16-2, at PageID # 143.) Finally, an earnings statement dated two weeks after his termination establishes that Plaintiff collected wages for forty hours of vacation pay in an amount of $642. There is no indication in the record of additional income that Plaintiff earned during the back-pay period. Accordingly, the undersigned finds that Plaintiff's actual income during that period was $19,083.30. Therefore, the undersigned will recommend that Plaintiff be awarded back pay for lost wages in the amount of $43,203.38 ($62,286.68 expected income minus $19,083.30 actual income).

### 2. Retirement Contributions

In his motion for default judgment, Plaintiff calculated lost retirement contributions in the amount of $1,237.95. (DN 12, at PageID # 28.) In support of this claim Plaintiff offered a sworn statement that while working for Defendant, he "received 4% employer contribution to [his] 401k retirement plan." (DN 12-1, at PageID # 30.) In the order for supplement, the undersigned found that Plaintiff had not offered a sufficient evidentiary basis to substantiate an amount of lost

retirement contributions because Plaintiff had not provided any explanation of how the employer contributions were calculated and deposited and this information was not otherwise apparent from the record. (DN 15, at PageID # 94.) The undersigned therefore ordered him to file any supplemental briefing explaining the basis of the claimed damages for retirement contributions and any supplementary evidence substantiating the amount of lost contributions. (*Id.* at 95.)

In his supplement to his motion for default judgment, Plaintiff calculates lost employer retirement contributions in the amount of $4,470.375. (DN 12, at PageID # 96.) Plaintiff offers a supplemental sworn statement in which he asserts, "It was my understanding that Metalsa contributed 4% of my gross yearly earnings to a retirement fund." (DN 16-2, at PageID # 101.) In support of this assertion, Plaintiff cites generally to his earnings statements. (*Id.*) Plaintiff's earnings statements show that beginning the week of January 6, 2020, Defendant began withholding employee elective 401(k) contributions from Plaintiff's wages. (DN 16-2, at PageID # 127–37.) The amounts withheld each amount to 4% of Plaintiff's gross wages for the same pay period. (*See id.*) Elective retirement fund contributions by Plaintiff are also reflected in his 2020 W-2 statement. (DN 12-8, at PageID # 86–87.) Based on this evidence, the undersigned concludes that the 4% 401(k) contributions recorded in Plaintiff's earnings statements do not represent compensation by Defendant.

The only indication in the record that Defendant may have also contributed to a dedicated fund held by Plaintiff is that on each earnings statement that shows amounts withheld for employee elective 401(k) contributions, there is also a separate entry under a heading "Other Benefits and Information" coded as "Et Pre Tax Mth" with corresponding dollar amounts for both the pay period and "total to date." (DN 16-2, at PageID # 127–37.) Given that these entries only appear on the earnings statements in tandem with employee elective 401(k) entries and that the amounts recorded

11

for these entries each pay period generally equate to half of the amount of the withheld employee contributions, one might suspect that the entries represent employer matching 401(k) contributions. The undersigned notes that Plaintiff has not suggested this to be the case and that the amount Plaintiff claims for retirement contributions is inconsistent with the amounts recorded under the "Et Pre Tax Mth" entries. Because of the vague coding of the "Et Pre Tax Mth" entries, the undersigned can only speculate that the corresponding dollar amounts represent employer contributions. In the undersigned's view, Plaintiff has had ample opportunity to substantiate lost retirement contributions. In the order for supplement, the undersigned observed: "Plaintiff does not explain how the 4% contributions were calculated and deposited, and it is not clear to the undersigned which entry or entries in his pay records represent these contributions." (DN 15, at PageID # 94.) Consequently, Plaintiff was afforded an opportunity to supplement his motion with additional explanation and supporting evidence. In his supplement, Plaintiff did not clarify how his earnings statements substantiate past employer retirement fund contributions, and instead inexplicably increased the amount of claimed lost contributions by more than a factor of three while expressing *less* certainty that Defendant actually made such contributions. (*Compare* DN 12-1, at PageID # 30 ("I also received a 4% employer contribution to my 401k retirement plan"), *with* DN 16-2, at PageID # 101 ("*It was my understanding that*, while employed at Metalsa, Metalsa contributed 4% of my gross yearly earnings to a retirement fund) (emphasis added).) Nor did Plaintiff provide additional corroborating documents such as a retirement fund account statement or Defendant's applicable employee benefits policy, and instead again only generally references the earnings statements as supportive of his claimed lost retirement contributions. (DN 16-2, at PageID # 101.) "While back pay in a Title VII case need not be proven with the exactitude of lost profits in a breach of contract case, neither can such an award be appropriately founded on

mere speculation." *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 880 (6th Cir. 1991). The undersigned finds that Plaintiff fails to meet his burden of offering sufficient proof of lost retirement fund contributions for the Court "to ascertain the amount of damages with reasonable certainty." *Vesligaj*, 331 F. App'x. at 355 (quoting *Credit Lyonnais*, 183 F.3d at 155. *See Kelley v. Carr*, 567 F. Supp. 831, 841 (W.D. Mich. 1983) ("A default judgment on well-pleaded allegations establishes only defendant's liability; *plaintiff must still establish the extent of damages*.") (emphasis added); *Mill's Pride, L.P. v. W.D. Miller Enter.*, *LLC*, No. 2:07-CV-990, 2010 WL 987167, at *1 (S.D. Ohio Mar. 12, 2010) (citing *LG Elec. v. Advance Creative Comput. Corp.*, 212 F. Supp. 2d 1171 (N.D. Cal. 2002) (stating that the civil rules "require that the party moving for a default judgment must present some evidence of its damages"); *JUUL Labs, Inc. v. HMN Inc.*, No. 2:20-CV-6570, 2021 WL 5240222, at *1 (S.D. Ohio May 4, 2021). Therefore, the undersigned will not recommend a back-pay award for lost retirement fund contributions.

### B. Attorney's Fees and Costs

Plaintiff has not identified any authority under which it requests the Court award his attorney's fees. Under Title VII, "a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1978). *See* 42 U.S.C. § 2000e-5(k); *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 804 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 (2006). Additionally, under the Kentucky Civil Rights Act, an award for a prevailing plaintiff's attorney's fees is mandatory. K.R.S. § 344.450. Therefore, the undersigned finds that Plaintiff is entitled to an award for his reasonable attorney's fees. Reasonable attorney's fees are calculated using the "lodestar" method, which is determined by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983);

*Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995).

In his motion for default judgment, Plaintiff calculated attorney's fees in the amount of $3,894.49. (DN 12, at PageID # 28.) Plaintiff provided a timesheet summarizing hours billed by his counsel for work on this case. (DN 12-9.) In the order for supplement, the undersigned found that the timesheet was not sufficiently detailed to determine whether the rates charged and the hours billed were reasonable. (DN 15, at PageID # 94–95.) The undersigned therefore ordered Plaintiff to file any supplemental evidence substantiating his reasonable attorney's fees, "including, if available, a more detailed timesheet that identifies the name and title of the individual recording each entry." (*Id.* at 95.) In his supplement, Plaintiff calculates attorney's fees in the amount of $3,669.49. (DN 16, at PageID # 96.) Plaintiff also provides an updated timesheet that includes additional information about counsel's billing. (DN 16-1, at PageID # 100.) The undersigned finds that the updated timesheet is sufficiently detailed for the undersigned to evaluate the reasonableness of requested fee amount. *See Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 553–54 (6th Cir. 2008). Accordingly, below the undersigned engages the lodestar analysis to determine Plaintiff's reasonable attorney's fees.

### 1. Reasonable Rates

"The party seeking attorneys' fees bears the burden of proving the reasonableness of the hourly rates claimed." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011) (quoting *Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir.1999)). In assessing whether a rate charged is reasonable, "courts use as a guideline the prevailing market rate . . . that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 618 (6th Cir. 2007).

Here, counsel billed the following rates:

| Name | Position | Hourly Rate |
|---|---|---|
| Andrew Dutkanych | Senior Attorney | $275 |
| Devan Dannely | Associate Attorney | $225 |
| Hannah Pitcher | Law Clerk | $175 |
| Gabriela Clarke | Paralegal | $75 |

Mr. Dutkanych executed a sworn statement in which he asserts, "These hourly rates are reasonable for private practice attorney's under the circumstances for the relevant community." (DN 16-1, at PageID # 98.)  Mr. Dannely also executed a sworn statement that his $225 hourly rate "is consistent with that of practitioners in this legal community with similar practices and experience." (DN 12-2, at PageID # 33.)  These contentions are too vague to comprise a foundation from which the undersigned can gauge the rates a similarly situated attorney in the local market could expect to charge for work on cases like this one.  Although the statement by Mr. Dutkanych that the above are "usual and customary rates[s]" charged by his firm is somewhat probative, the weight of this evidence is minimal without knowing the types of cases the firm typically litigates and the level experience and skill of its attorneys.  Consequently, in considering whether counsel's rates are reasonable, the undersigned relies on his expertise and judgment as well as rates found reasonable by courts in Kentucky in similar cases.  The undersigned finds that the rates charged by Mr. Dutkanych and Mr. Dannelly are consistent with the rates that federal courts in Kentucky have found reasonable when billed respectively by senior and junior attorneys in simple employment and civil rights cases.  *See Hendricks v. Quickway Transportation, Inc.*, No. 3:20-CV-710-BJB-CHL, 2021 WL 1235265, at *4 (W.D. Ky. Apr. 2, 2021) ("[F]ederal courts in and around Kentucky recently have found that hourly rates between approximately $300 and $400

15

represented reasonable partner rates in employment disputes."); *Crouch v. Rifle Coal Co., LLC*, No. CIV. A. 08-299-ART, 2010 WL 2961181, at *2 (E.D. Ky. July 26, 2010) (collecting prior findings as to the prevailing market rate in Kentucky and finding "$200 is a reasonable median within this range" for experienced attorney's in civil rights litigation); *ACLU of Kentucky, Inc. v. Grayson Cnty.*, No. 4:01-cv-202, 2008 WL 5101672, 2008 U.S. Dist. LEXIS 96800 (W.D. Ky. Nov. 26, 2008) (setting an hourly rate of $300 for an attorney with thirty-one years of experience and an hourly rate of $180 for an attorney with eight years of experience). Here, based on the undersigned's expertise and judgment with respect to reasonable rates in the local market as well as the undersigned's knowledge of Mr. Dutkanych's and Mr. Dannelly's respective experience and skill, the undersigned likewise finds the rates to be in line with the prevailing market rate.

Turning to the hourly rates charged for law clerk work performed by Ms. Pitcher and paralegal work performed by Ms. Clarke, Plaintiff has not offered evidence probative of the prevailing market rate for these services in this venue. The Court therefore relies on rates that courts in Kentucky have found reasonable for similar services, and consistent with those decisions, finds that the rates charged for law clerk and paralegal work performed for this case are reasonable. *See Mitcham v. Intrepid U.S.A., Inc.*, No. 3:17-cv-703, 2019 WL 5496023, at *4 (W.D. Ky. May 28, 2019) (finding rate of "$150/hour for Professional Staff's time . . . consistent with market rates throughout Kentucky and Tennessee"); *Agee v. Bedrock Contracting, Inc.*, No. CV 5:14-438-DCR, 2016 WL 1175053, at *1 (E.D. Ky. Mar. 24, 2016) ($105 hourly rate for paralegal "d[id] not appear to be unreasonable"); *Clark v. W. Iris Transp., Inc.*, No. CV 18-168-DLB-CJS, 2020 WL 2781601, at *4 (E.D. Ky. Feb. 27, 2020), *report and recommendation adopted*, No. CV2018168WOBCJS, 2020 WL 2789910 (E.D. Ky. Mar. 19, 2020) ("In this Court's own expertise and judgment . . . $125 per hour, is appropriate for staff work."); *Pogue v. Nw. Mut. Life*

*Ins. Co.*, No. 3:14-CV-598-CRS, 2017 WL 1520432, at *4 (W.D. Ky. Apr. 25, 2017) (recognizing that it was higher than the average rate for paralegals in the local market, but nonetheless finding that "$190 is a reasonable hourly rate under these particular circumstances").

### 2. Reasonable Number of Hours Expended

Plaintiff's counsel billed for about fifteen hours of work in total performed by attorneys and staff between March 16, 2020 and November 1, 2021. (DN 12-9, at PageID # 88.) Among the entries on counsel's updated timesheet, 1.2 hours were billed by Mr. Dutkanych for an initial client meeting and .5 hours were billed by Mr. Dannelly for subsequent client communications. (*Id.*) This work is consistent with counsel's duty of diligence and duty to keep clients reasonably informed of developments in the case, and the undersigned finds that the time was reasonably expended in light of the needs of the case. Ms. Pitcher and Ms. Clarke collectively billed about five hours billed for work performed on an EEOC charge prior to the filing of this action. (*Id.*) Exhausting administrative remedies through the EEOC is a prerequisite to filing suit under Title VII, and the undersigned finds that the time as described on the updated timesheet was reasonably expended in light of the needs of the case. *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 54, 100 S. Ct. 2024, 2026, 64 L. Ed. 2d 723 (1980) (holding that Title VII authorizes courts to award fees to a prevailing plaintiff for work performed in state administrative proceedings and before the EEOC prior filing federal lawsuit was filed). Mr. Dannelly also billed 7.25 hours for case file review, filing documents with the Court, and drafting and editing related to the motion for default judgment. (DN 12-9, at PageID # 88.) This work advanced Plaintiff toward obtaining a default judgment following the Clerk of Court's entry of default, (*see* DN 6), and undersigned finds that the time as described on the updated timesheet was reasonably expended in light of the

17

needs of the case. The foregoing reasonably expended hours will be included in the undersigned's lodestar calculation.

Finally, the updated timesheet shows 1.5 hours billed by Mr. Dannelly for drafting a response to the Court's September 30, 2022 show cause order (DN 9). (*Id.*, at PageID # 88.) In the show cause order, the Court noted that following the Clerk's entry of default, Plaintiff failed to file a motion for default judgment, and as a result, he was ordered to file a status report. (DN 9, at PageID # 22.) Because Plaintiff failed to timely comply with the order for a status report, the Court directed Plaintiff to show cause for why the case should not be dismissed for failure to prosecute. (*Id.*) On October 6, 2021, Plaintiff filed a status report in response to the show cause order in which he explained: "Due to travel and mere oversight by the undersigned, Plaintiff's counsel was unaware of the deadline to submit the Status Report. Plaintiff's counsel failed to submit the Status Report." (DN 10, at PageID # 24.) Because the fees incurred drafting the response to the show cause order resulted from Mr. Dannelly's failure to monitor Court imposed deadlines, the undersigned finds that these hours were not reasonably expended in pursuit of the success that Plaintiff hopes to achieve through this litigation. *See Hensley*, 461 U.S. at 435 (quoting *Davis v. Cty. of Los Angeles*, No. 73-63-WPG, 1974 WL 180, at *3 (C.D. Cal. June 5, 1974)). The undersigned therefore will not include the hours spent drafting the response to the show cause order in the lodestar calculation.

### 3. Proposed Fee Award

Consistent with the analysis above, the undersigned's lodestar calculation is as follows.

| Name | Reasonable Rate | Reasonable Hours[5] | Rate x Hours |
|---|---|---|---|
| Andrew Dutkanych | $275 | 3.2 | $880 |

---

[5] Hours for Ms. Pitcher and Ms. Clarke were billed in increments rounded to the hundred-thousandth of an hour. (DN 16-1, at PageID # 100.) Additionally, in one entry, Mr. Dannelly billed in increments to the hundredth of an hour. (*Id.*) Consistent with standard billing practice, the undersigned rounds their billed time to the tenth of an hour.

18

| Devan Dannely | $225 | 7.8 | $1,755 |
| --- | --- | --- | --- |
| Hannah Pitcher | $175 | 2.4 | $420 |
| Gabriela Clarke | $75 | .4 | $30 |
| **Total Lodestar** | | | **$3,085** |

There is "[a] strong presumption that the lodestar figure . . . represents a 'reasonable' fee . . . ." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986). Although the Court may modify the lodestar amount under certain circumstances, "modifications to the lodestar are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000) (citation omitted). In those cases, it may deviate up or down to achieve a reasonable result by considering the so-called *Johnson* factors. *Geier v. Sundquist*, 372 F.3d 784, 792 (6th Cir. 2004). These factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* (quoting *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)).

The undersigned has already considered many of the *Johnson* factors in the lodestar analysis and finds that none of the remaining factors justify an adjustment to the lodestar amount. Therefore, the undersigned will recommend that the Court award Plaintiff $3,085 for his attorney's fees. Additionally, Plaintiff seeks an award for costs. (DN 16, at PageID # 96.) Counsel's updated

timesheet includes an entry for the Court's filing fee in the amount of $402 dollars. (DN 16-1, at PageID # 100.) The undersigned finds that the amount requested is reasonable, and that the cost of the filing fee was necessarily incurred in pursuit of Plaintiff's claims. Therefore, the undersigned will recommend that the Court award Plaintiff $402 for his costs.

### III. RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for default judgment (DN 12) be **GRANTED in part and DENIED in part**.

The undersigned further **RECOMMENDS** that Plaintiff be awarded a judgment against Defendant in the amount of $43,203.38 for back pay, $3,085 for his reasonable attorney's fees expended in the prosecution of this action, and $402 for the cost of the filing fee.

Colin H Lindsay, Magistrate Judge
United States District Court

May 18, 2022
cc: Counsel of record

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations. A copy shall forthwith be electronically transmitted or mailed to all parties. 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Civ. P. 72(b)(2). Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal. *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).